**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION**

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>                Plaintiff,<br><br>            v.<br><br>ROBERT M. THOMPSON AND FINANCIAL FREEDOM FOUNDATION, d/b/a F3 MASTERMIND,<br>                Defendants,<br><br>and<br><br>BRANDON K. STUCKI,<br><br>                Relief Defendant. | Case No. _____<br><br>JURY TRIAL REQUESTED |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("SEC") alleges as follows:

### NATURE OF THE CASE

1.      This matter involves fraud committed by Robert M. Thompson ("Thompson") through the alter-ego entity he owns and controls, the Financial Freedom Foundation, d/b/a F3 Mastermind ("F3 Mastermind"). Since at least 2019, Thompson, a resident of southwestern Missouri, has marketed F3 Mastermind as a private membership group for investors seeking passive investment income.

2.      According to Thompson, he is a graduate of an elite, world-renowned business school, and a member of American Mensa.

3.      In promotional materials posted on YouTube and on publicly-available portions of F3 Mastermind's website, Thompson and F3 Mastermind have stated that, in exchange for a payment of an initial registration fee and recurring monthly membership fees, F3 Mastermind members would gain access to purportedly exclusive trading programs, run by third-party operators. According to Thompson and F3 Mastermind, these trading programs would generate steady and large amounts of passive investment income, supposedly with little or no risk.

4.      From at least early 2019 through the present, Defendants Thompson and F3 Mastermind have offered investments in trading programs, run by third-party operators, that purport to generate risk-free returns ranging from 20% per week to 4000% per year. Between early 2019 and mid-2022, Thompson and F3 Mastermind recommended these investments – which Thompson and F3 Mastermind refer to as "Level 2" investments – to at least five F3 Mastermind members, located in Missouri, Kentucky, and California, who subsequently invested in these programs.

5.      As described in more detail in this Complaint, the Level 2 trading programs that Thompson and F3 Mastermind have offered to investors bear all the hallmarks of "prime bank" investment schemes. "Prime bank" investment schemes are frauds typically characterized by, among other things, the promise that they will generate spectacular returns for investors (sometimes equal to many times the original investment), while exposing the investors to little or no investment risk. Other characteristics often associated with such scams include, among other things: (a) purported trading in credible sounding financial instruments, such as medium term bank notes, issued by top world banks; (b) claims that the investments are secretive or exclusive; and (c) the use of vague or complex terms and structures to obscure the source of the phenomenal returns promised to investors.

6.      In reality, no legitimate investment exists that is capable of guaranteeing the returns promised in such schemes, while, at the same time, exposing investors to minimal, if any, risk.

7.      Several government agencies, including the SEC, the U.S. Department of Treasury, and the Federal Bureau of Investigation, have posted investor alerts and warnings for many years on their publicly available websites about fictitious "prime bank" investments.

8.      From 2019 to 2022, Thompson and F3 Mastermind recommended three separate prime bank trading schemes to F3 Mastermind members. Thompson and F3 Mastermind acted with at least severe recklessness by falsely stating that these programs were real and that the programs provided extraordinary investment returns with little or no risk. As a result of Thompson's and F3 Mastermind's severely reckless false statements about these fictitious programs, five F3 Mastermind members invested in these prime bank schemes and collectively provided $2 million to the third-party operators who conducted the schemes.

9.      In early 2019, based on Thompson's recommendation, one of these F3 Mastermind members invested $1 million in one of the prime bank trading programs that Thompson and F3 Mastermind promoted (the "First Prime Bank Scheme"). Later in 2019, the third-party operator of the scheme returned approximately $600,000 of the investor's principal, but, as of the date of this Complaint, the investor has neither received back the remaining approximate $400,000 amount of his principal nor any profit or other gain on his investment.

10.     Then, during 2020, based on Thompson's recommendation, three other F3 Mastermind members made investments of $200,000, $100,000, and $100,000, respectively, in a second prime bank scheme (the "Second Prime Bank Scheme"). As of the date of the Complaint, these investors have neither received back their principal nor any profit or other return on their

investments.

11.     Finally, in mid-2022, based on Thompson's recommendation, another F3 Mastermind member invested $600,000 in a third prime bank scheme (the "Third Prime Bank Scheme") (together, with the First and Second Prime Bank Schemes, the "Prime Bank Schemes"). As of the date of the Complaint, this investor has neither received back his principal nor any profit or other return on his investment.

12.     Despite these investors' failure to obtain the returns that were promised to them through their respective investments in the Prime Bank Schemes, as of the date of this Complaint, Thompson continues to promote prime bank programs through F3 Mastermind's website, located at www.thefinanciafreedomfoundation.org, claiming that these programs "pay 20% per month or more."

13.     While F3 Mastermind members have failed to receive any, or a substantial portion, of the principal they invested in the Prime Bank Schemes, Thompson and F3 Mastermind have profited. In one instance, the F3 Mastermind member who invested $1 million in the First Prime Bank Scheme in 2019 paid Thompson and F3 Mastermind approximately $30,000 under a "profit sharing" agreement, after the investor received approximately $600,000 out of the $1 million that he had invested. In another instance, after a F3 Mastermind member invested a total of $600,000 through two investments into the Third Prime Bank Scheme in mid-2022, Thompson and F3 Mastermind received a total of $30,000 in two separate payments of commissions from the third-party operator of the scheme.

14.     Thompson and F3 Mastermind have also profited through investors' initial and monthly membership fees in F3 Mastermind, which investors paid to gain access to investment opportunities recommended by Thompson and F3 Mastermind, including purportedly profitable,

risk-free Level 2 investments.

15. Additionally, one of Thompson's business associates, Relief Defendant Brandon K. Stucki ("Stucki"), profited from F3 Mastermind members' investments in the Prime Bank Schemes. Stucki sometimes worked with Thompson to communicate with F3 Mastermind members and facilitate F3 Mastermind members' investments. When three F3 Mastermind members collectively invested $400,000 into the Second Prime Bank Scheme in 2020, Stucki received an approximate $10,000 referral fee from the operator of the scheme.

16. As a result of the conduct described in this Complaint, Defendants Thompson and F3 Mastermind have violated, and unless restrained and enjoined, will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, and Sections 206(1) and (2) of the Investment Advisers Act of 1940 ("Advisers Act"). Defendant Thompson also is liable as a control person for F3 Mastermind's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

17. Relief Defendant Stucki obtained ill-gotten gains as a result of misconduct by Defendants Thompson and F3 Mastermind.

18. Based on Defendants Thompson's and F3 Mastermind's violations of the federal securities laws, the SEC seeks a permanent injunction enjoining Thompson and F3 Mastermind from future violations of the anti-fraud provisions of the Securities Act, Exchange Act, and Advisers Act. The SEC also seeks an order requiring Defendants Thompson and F3 Mastermind, jointly and severally, and Relief Defendant Stucki, to disgorge their ill-gotten gains, with prejudgment interest. The SEC also seeks an order requiring Defendants Thompson and F3 Mastermind each to pay a significant civil penalty, and an order precluding Defendant Thompson

from serving as an officer or director of a public company.

## JURISDICTION AND VENUE

19.     The SEC brings this action under Section 20(b) [15 U.S.C. §77t(b)] of the Securities Act, Sections 21(d) and (e) [15 U.S.C. §§78u(d) and 78u(e)] of the Exchange Act, and the Sections 209(d) and 209(e) [15 U.S.C. §§ 80b-9(d), 80b-9(e)] of the Advisers Act.

20.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Sections 209(d), 209(e), and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), and 80b-14].

21.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14]. Defendant Thompson resides in this district and transacts business in this district, and many of the acts, practices, and courses of business constituting the violations alleged herein occurred within this district. Moreover, three of the victims of Defendants' securities law violations reside in this district.

22.     Defendants Thompson and F3 Mastermind directly and indirectly made use of the means or instruments of transportation or communication in, and the means and instruments of, interstate commerce or of the mails, in connection with the acts, practices, and courses of business alleged in this Complaint.

23.     There is a reasonable likelihood that Thompson and F3 Mastermind will, unless permanently enjoined, continue to engage in the transactions, acts, practices and courses of business set forth in this Complaint, and transactions, acts, practices and courses of business of similar purport and object.

## DEFENDANTS

24.     **Robert M. Thompson**, age 50, is currently a resident of Reeds Spring, Missouri.
Thompson solely owns and controls the Financial Freedom Foundation, d/b/a F3 Mastermind.
Thompson was formerly a trader with a SEC-registered broker/dealer, but he has not been
associated with a SEC registrant since 1996.

25.     **Financial Freedom Foundation, d/b/a F3 Mastermind,** is a State of Texas non-
commercial entity established by Thompson in Houston, Texas in 2010. F3 Mastermind is not
registered with the SEC in any capacity.

## RELIEF DEFENDANT

26.     **Brandon K. Stucki**, age 39, is currently a resident in Murphy, Texas. He has
never been registered with the SEC or associated with any SEC registrant.

## FACTS

A.     **Thompson and F3 Mastermind Solicit Prospective F3 Mastermind Members With
Promises of Steady Passive Investment Income With Little or No Investment Risk**

27.     From at least January 2019 through the present, Thompson and F3 Mastermind
have solicited new F3 Mastermind members through, among other means, promotional videos
posted on YouTube and through publicly-available portions of F3 Mastermind's website. As the
sole owner of F3 Mastermind, Thompson is responsible for, and has ultimate authority for, the
contents of F3 Mastermind's website.

28.     In promotional materials, Thompson regularly has touted the investing acumen
that he purportedly gained through his studies at an elite educational institution and through his
years of experience as a professional investor.

29.     For example, in one promotional video posted on YouTube, Thompson stated that
he graduated from the University of Pennsylvania's Wharton School of Business, adding that the

school was ranked by the Financial Times as the number one business school in the world as of his 2007 graduation from the school. He stated that his ability to attend the school was like obtaining a "winning lottery ticket" because his education there provided him with "specialized knowledge." Thompson also stated that he was a member of American Mensa, which is a "genius society." In the same video, Thompson stated that before and after graduating from Wharton, he gained "10 years of experience in private equity."

30. Similarly, in publicly-available portions of F3 Mastermind's website, Thompson and F3 Mastermind stated that "[o]ur founder has an MBA from the Wharton School of Finance," plus "over 10 yrs experience in Alternative Investments."

31. In promotional videos posted on YouTube and through publicly-available portions of F3 Mastermind's website, Thompson and F3 Mastermind have enticed prospective F3 Mastermind members with promises of access to exclusive passive investment income opportunities that purportedly provide large amounts of steady income while presenting little or no investment risk.

32. In publicly-available portions of F3 Mastermind's website, Thompson and F3 Mastermind stated that they perform "thorough due diligence" on every investment opportunity that they offer and recommend to F3 Mastermind members.

33. The investment opportunities that Thompson and F3 Mastermind promoted include Level 2 investments.

34. In a promotional video posted on YouTube, Thompson and F3 Mastermind described a Level 2 investment as a "Managed Buy/Sell" program. According to Thompson and F3 Mastermind, a Managed Buy/Sell Program involves the "simultaneous purchase and sale of the exact same asset at the exact same time, but at different price point[s]." Thompson and F3

Mastermind claimed that "[b]ank traders do this all day long, every day, but on international financial markets," using "Medium Term Notes." Thompson and F3 Mastermind stated that such trading "is THE definition of **RISK FREE ARBITRAGE**" (emphasis in original). Thompson and F3 Mastermind claimed that such programs are offered on a "[p]rivate, invitation only" basis by major overseas banks, pay monthly returns of 20% or more, and present no risk to the investor's principal. Thompson and F3 Mastermind stated that these returns were "contractual returns."

**B.** **Thompson and F3 Mastermind Make False Statements on F3 Mastermind's Website About Level 2 Investments and Encourage F3 Mastermind Members to Make These Level 2 Investments with Thompson's and F3 Mastermind's Help**

35.    On F3 Mastermind's website, Thompson and F3 Mastermind stated that, in return for an initial membership fee ranging from approximately $8,000-$10,000, plus a recurring $99 per monthly membership fee, a F3 Mastermind member would get access to an enhanced "gold" level of membership, which would enable the member to make Level 2 investments. According to Thompson and F3 Mastermind, the gold level of membership is the level at which Thompson and F3 Mastermind provide "handholding" to the member. According to Thompson and F3 Mastermind, Level 2 investing is a "whole different level of investing."

36.    Once an investor became a F3 Mastermind member, the investor obtained access to members-only portions of F3 Mastermind's website, which provided additional detail on Level 2 investments.

37.    In the members-only portions of F3 Mastermind's website, Thompson and F3 Mastermind stated that "[t]here are perhaps only five Trade Platforms in the world" that are "certified" to engage in the trading involved in Level 2 investments, "so the circle is very small." Thompson and F3 Mastermind stated that "[i]t took us over a decade of building relationships in

order to gain access" to these trades. Thompson and F3 Mastermind stated that "to comply with the 3rd party rule, which prohibits traders from being investors and keeping these programs solely among themselves, they open these transactions up to investors by using what is called a Blocking Trade. This means that a client's funds are temporarily placed under an internal or administrative hold at their bank (must be a Top 50 Commercial Bank). This provides proof of funds and is designed such that there is absolutely no risk to the client." Thompson and F3 Mastermind reiterated to members that the investor's "funds are never put at risk and the contract guarantees against loss of principal." Thompson and F3 Mastermind stated that, in Level 2 investing, the investor's "funds are never touched," nor "are the funds required to be pledged or subject to a lien." Thompson and F3 Mastermind stated that the "Investor's capital is not put at risk in the trading. The investor's capital is not physically involved (prohibited use) with the buy and re-sale exchange activities generating the profit. An Investor's capital always sits in their own bank account, without liability of lien, encumbrance, transfer of control, or subject to first call by anyone" (emphasis in original). Thompson and F3 Mastermind stated that for a trade duration of one year, the cumulative return in Level 2 investing would be over 4000 percent. Thompson and F3 Mastermind stated that these returns were not speculative because "returns are contractual."

38.     Thompson's and F3 Mastermind's statements to F3 Mastermind members about Level 2 investing were materially false. The Level 2 trading programs that Thompson and F3 Mastermind promoted do not exist. There is no legitimate investment that is capable of providing the sorts of returns that Thompson and F3 Mastermind identified for Level 2 investments, featuring profits of as much as 4000% per year, while, at the same time, exposing investors to no risk. Instead, these investments are fictitious prime bank trading schemes.

**C.     Based on Thompson's and F3 Mastermind's Recommendations, Five F3 Mastermind Members Made Investments in the Prime Bank Schemes**

39.     Starting in at least early 2019, at least five F3 Mastermind members made Level 2 investments, which in reality were prime bank trading schemes.

**The First Prime Bank Scheme**

40.     First, in early 2019, based on Thompson's and F3 Mastermind's recommendation, a F3 Mastermind member ("F3 Mastermind Member A") invested $1 million in the First Prime Bank Scheme. A third-party operator purportedly based in New Zealand conducted the First Prime Bank Scheme.

41.     In addition to recommending the First Prime Bank Scheme to F3 Mastermind Member A, Thompson also recommended this investment to at least one other investor, who was not a F3 Mastermind member.

42.     Before F3 Mastermind Member A invested in the First Prime Bank Scheme, he reviewed F3 Mastermind's website and spoke with Thompson. Thompson told the member that the investment represented a good Level 2 investing opportunity. Thompson told the member that Thompson had extensive experience with these sorts of investments and that the investments often were successful. Thompson also told the member that Thompson had a source who had previously made a successful investment with the third-party operator. Thompson told the member that the investment was a compound trading program that would generate returns of 50% per month, compounded every month for 12 months. Thus, according to Thompson, the investment would generate returns of at least 600% over a 12-month period.

43.     F3 Mastermind Member A invested in the First Prime Bank Scheme based on Thompson's recommendation.

44.     F3 Mastermind Member A agreed with Thompson that the member would compensate Thompson for recommending the investment by giving Thompson five percent of all investment returns. When the operator of the First Prime Bank Scheme sent payment of $600,000 to F3 Mastermind Member A later in 2019, F3 Mastermind Member A sent approximately $30,000 to Thompson and F3 Mastermind.

45.     The operator of the First Prime Bank Scheme never made any other payments to F3 Mastermind Member A beyond the $600,000 that the operator sent to the member in 2019. Accordingly, F3 Mastermind Member A did not remit any further amounts to Thompson beyond the approximately $30,000 in payments to Thompson. Because Thompson never received any other payments from F3 Mastermind Member A arising from the member's investment in the First Prime Bank Scheme, Thompson knew, or was severely reckless in not knowing, that F3 Mastermind Member A had neither received back the remaining approximate $400,000 of his principal nor any profit or other gain on his investment. Therefore, Thompson knew, or was severely reckless in not knowing, that F3 Mastermind Member A's investment in the First Prime Bank Scheme had been unsuccessful.

**The Second Prime Bank Scheme**

46.     Despite having known, or having been severely reckless in not knowing, that F3 Mastermind Member A's 2019 investment in the First Prime Bank Scheme had been unsuccessful, Thompson and F3 Mastermind proceeded to recommend the Second Prime Bank Scheme in the spring of 2020 to three other F3 Mastermind members ("F3 Mastermind Members B, C, and D," respectively). The third-party operator of the Second Prime Bank Scheme was purportedly based in Australia.

47.     In April 2020, F3 Mastermind emailed members, stating that F3 Mastermind had a "rare opportunity" for members to make a new Level 2 investment, which was a reference to the Second Prime Bank Scheme.

48.     Based on Thompson's recommendation, F3 Mastermind Members B, C, and D, all of whom are residents of southwestern Missouri, invested $200,000, $100,000, and $100,000, respectively, in the Second Prime Bank Scheme in approximately May 2020.

49.     Just like F3 Mastermind Member A had done before he invested in the First Prime Bank Scheme in 2019, before F3 Mastermind Members B, C, and D invested in the Second Prime Bank Scheme in 2020, they reviewed F3 Mastermind's website and spoke with Thompson.

50.     Thompson told F3 Mastermind Members B, C, and D that the Second Prime Bank Scheme would provide 30% contractual returns per month and that the members' principal would never be put at risk.

51.     Once F3 Mastermind Members B, C, and D decided to invest in the Second Prime Bank Scheme, Thompson assisted these members in completing the paperwork needed to make the investment and in sending wire transfers for the investments to the third-party operator of the scheme.

52.     Within a few months of the investments by F3 Mastermind Members B, C, and D in the Second Prime Bank Scheme, the third-party operator of the scheme stopped responding to their inquiries about the status of their investments. Accordingly, by late 2020, F3 Mastermind Members B, C, and D asked Thompson and F3 Mastermind to assist the members in obtaining information about the status of their investments.

53.     Telling F3 Mastermind Members B, C, and D that he was using "back channels" to find information, Thompson reported to them in approximately early 2021 that the flow of information about the investments, and the return of the investors' principal and purported profits, was being delayed by the Covid-19 pandemic. Thompson advised F3 Mastermind Members B, C, and D to be patient, stating in a May 2021 email: "Being patient can be difficult, maybe that's why it is said to be a virtue."

54.     Shortly after F3 Mastermind Members B, C, and D collectively made their 2020 investments totaling $400,000 in the Second Prime Bank Scheme, the third-party operator of the scheme sent Relief Defendant Stucki a payment of approximately $10,000, representing approximately 2.5% of the total amount that F3 Mastermind Members B, C, and D collectively invested in the scheme.

55.     However, the third-party operator of the Second Prime Bank Scheme never made any payments to F3 Mastermind Members B, C, and D. As of the date of this Complaint, F3 Mastermind Members B, C, and D have not recovered any of the principal amounts of their investments, let alone any profit or other investment gain.

56.     From late 2020 through mid-2022, F3 Mastermind Members B, C, and D repeatedly advised F3 Mastermind and Thompson of the members' failure to recover their principal or any profit or other return on their investments. The members requested F3 Mastermind's and Thompson's assistance to recover their investments, which F3 Mastermind and Thompson purportedly attempted to provide. Therefore, Thompson knew, or was severely reckless in not knowing, that F3 Mastermind Members B, C, and D neither received back their principal nor any profit or other return on their investments. Therefore, Thompson knew, or was

severely reckless in not knowing, that the investments by F3 Mastermind Members B, C, and D in the Second Prime Bank Scheme had been unsuccessful.

**The Third Prime Bank Scheme**

57.     Despite having known, or having been severely reckless in not knowing, that F3 Mastermind Member A's 2019 investment in the First Prime Bank Scheme had been unsuccessful, and that the 2020 investments by F3 Mastermind Members B, C, and D in the Second Prime Bank Scheme had been unsuccessful, Thompson and F3 Mastermind proceeded to recommend the Third Prime Bank Scheme in the summer of 2022 to another F3 Mastermind member ("F3 Mastermind Member E").

58.     Beginning in approximately May 2022, F3 Mastermind Member E invested a total of $600,000 in the Third Prime Bank Scheme, which was a Level 2 investment called Landes Prive. This prime bank scheme was run by the third-party operator Charles T. Lawrence, Jr. ("Lawrence"). Landes Prive was a purported Swedish financial services company with United States-based subsidiaries.

59.     In May 2023, the SEC sued Lawrence for conducting an offering fraud and misappropriating almost all investor funds invested in Landes Prive. *See SEC v. Charles T. Lawrence, Jr., et. al*, Case No. 23-cv-550-PP (E.D. Wis.). Additionally, Lawrence was indicted by federal criminal authorities in the Eastern District of Wisconsin for the same underlying conduct. *USA v. Charles Lawrence*, Case No. 23-CR-96 (E.D. Wis.).

60.     Prior to F3 Mastermind Member E's investment in the Third Prime Bank Scheme, Thompson emailed the member in May 2022 with "details of the small cap trade" that Thompson and the member had previously discussed over the phone. In Thompson's May 2022 emails to F3 Mastermind Member E, Thompson told the member that Thompson had been told that the

investment was a "performing small cap trade via a registered Sweden Trust;" under the agreement between an investor and the third-party operator, "[a]ll funds will be in the clients (sic) Landes account and visible at all times," the investor's "[p]rinciple (sic) investment will be blocked but not at risk," and "[h]istorical and anticipated profits of 50% weekly are possible and likely;" and that "PROFITS ARE REPORTED WEEKLY TO THE INVESTOR BY THE TRUST BUT ARE ONLY PAID IN FULL TO THE CLIENT ACCOUNT AFTER TWELVE WEEKS OF COMPOUNDING." Thus, according to Thompson, the agreement provided that investment returns of at least 600% were "possible and likely" after a 12-week period. Thompson also told F3 Mastermind Member E that Thompson had been told "by the gentleman in London who brought it to me" that another investor had successfully made an investment in Landes Prive.

61.     In approximately May 2022, F3 Mastermind Member E invested $500,000 in Landes Prive. Then, in approximately July 2022, F3 Mastermind Member E invested an additional $100,000 in Landes Prive, for a total investment of $600,000 by F3 Mastermind Member E in the Third Prime Bank Scheme.

62.     In approximately June 2022, Landes Prive sent Thompson and F3 Mastermind a $25,000 payment, representing 5% of the amount that F3 Mastermind Member E had invested in in approximately May 2022. Then, in approximately July 2022, Landes Prive sent Thompson and F3 Mastermind an additional $5,000, representing 5% of the $100,000 additional amount that F3 Mastermind E had invested.

63.     Landes Prive never made any payments to F3 Mastermind Member E. Accordingly, as of the date of this Complaint, F3 Mastermind Member E has neither received back his principal nor any profit or other return on his investment.

D.    **Thompson and F3 Mastermind Continue to Promote Prime Bank Trading Schemes**

64.    Despite having known, or having been severely reckless in not knowing, that F3 Mastermind Member A's 2019 investment in the First Prime Bank Scheme was unsuccessful, that the 2020 investments by F3 Mastermind Members B, C, and D in the Second Prime Bank Scheme were unsuccessful, and that F3 Mastermind Member E's 2022 investment in the Third Prime Bank Scheme was unsuccessful, Thompson and F3 Mastermind continue to tout Level 2 investments. As of the date of this Complaint, F3 Mastermind's public website states that with a gold level membership in F3 Mastermind, "we analyze your current starting point and then create a fast-track to not just the $100k Passive Income, but to quickly get you to the $1MM mark so that you can then get to Level 2 Managed Buy/Sell Programs that pay 20% per month or more. 20% per month on $1M is $200k per month. So **if you're not currently undergoing financial hardship, then <u>go for the Gold"</u>** (emphasis in original).

## COUNT I

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**[15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]**
**(Defendants Thompson and F3 Mastermind)**

65.    The SEC realleges and incorporates by reference the allegations set forth in paragraphs 1 through 64 as if fully set forth herein.

66.    By engaging in the conduct described in this Complaint, Defendants Thompson and F3 Mastermind, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails: (a) used and employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud and deceit upon

purchasers and prospective purchasers of securities.

67.     Thompson and F3 Mastermind acted knowingly or with severe recklessness in engaging in the activities described herein.

68.     By reason of the foregoing, Thompson and F3 Mastermind violated, and unless enjoined will likely again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## COUNT II

**Violations of Section 20(a) of the Exchange Act**
**[15 U.S.C. § 78t(a)]**
**(Defendant Thompson)**

69.     The SEC realleges and incorporates by reference the allegations set forth in paragraphs 1 through 64 as if fully set forth herein.

70.     As described above, Defendant F3 Mastermind violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

71.     Through his position and responsibilities, Defendant Thompson exercised general control over the operations of F3 Mastermind.

72.     Through his position and responsibilities, Defendant Thompson possessed the power or ability to control the specific transactions and activities upon which Defendant F3 Mastermind's violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder are based, whether or not that power was exercised.

73.     Pursuant to Section 20(a) of the Exchange Act, [15 U.S.C. §78t(a)], Defendant Thompson is liable for Defendant F3 Mastermind's violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

# COUNT III

## Violations of Section 17(a)(1) of the Securities Act
## [15 U.S.C. § 77q(a)(1)]
## (Defendants Thompson and F3 Mastermind)

74.     The SEC realleges and incorporates by reference the allegations set forth in

paragraphs 1 through 64 as if fully set forth herein.

75.     By engaging in the conduct described in this Complaint, Thompson and F3

Mastermind, directly or indirectly, singly or in concert with others, in the offer and sale of

securities, by use of the means and instruments of transportation and communication in interstate

commerce and by use of the mails, employed devices, schemes and artifices to defraud.

76.     Thompson and F3 Mastermind acted knowingly or with severe recklessness in

engaging in the activities described herein.

77.     By reason of the foregoing, Thompson and F3 Mastermind violated, and unless

enjoined will likely again violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

# COUNT IV

## Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
## [15 U.S.C. §§ 77q(a)(2) and (3)]
## (Defendants Thompson and F3 Mastermind)

78.     The SEC realleges and incorporates by reference paragraphs 1 through 64 as if

fully set forth herein.

79.     By engaging in the conduct described above, Thompson and F3 Mastermind,

directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use of

the means and instruments of transportation and communication in interstate commerce and by

use of the mails: (a) obtained money or property by means of untrue statements of material fact

or omissions to state material facts necessary in order to make the statements made, in light of

the circumstances under which they were made, not misleading; and (b) engaged in transactions,

practices or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

80.     Thompson and F3 Mastermind acted knowingly, with severe recklessness, or negligently in engaging in the activities described herein.

81.     By reason of the foregoing, Thompson and F3 Mastermind violated, and unless enjoined will likely again violate, Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT V

**Violations of Section 206(1) of the Advisers Act**
**[15 U.S.C. § 80b-6(1)]**
**(Defendants Thompson and F3 Mastermind)**

82.     The SEC realleges and incorporates by reference paragraphs 1 through 64 as if fully set forth herein.

83.     At all relevant times, Thompson and F3 Mastermind acted as "investment advisers" within the meaning of Section 202(a)(ll) of the Advisers Act [15 U.S.C. § 80b-2(a)(ll)].

84.     By engaging in the conduct described above, Thompson and F3 Mastermind, while acting as investment advisers, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, employed devices, schemes, or artifices to defraud clients or prospective clients.

85.     Thompson and F3 Mastermind acted knowingly or with severe recklessness in engaging in the activities described herein.

86.     By reason of the foregoing, Thompson and F3 Mastermind have violated and, unless enjoined, will likely again violate, Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

## COUNT VI

### Violations of Section 206(2) of the Advisers Act
### [15 U.S.C. § 80b-6(2)]
### (Defendants Thompson and F3 Mastermind)

87.     The SEC realleges and incorporates by reference paragraphs 1 through 64 and 83 as if fully set forth herein.

88.     By engaging in the conduct described above, Thompson and F3 Mastermind, while acting as investment advisers, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly engaged in transactions, practices, or courses of business which operate as a fraud or deceit upon clients or prospective clients.

89.     Thompson and F3 Mastermind acted knowingly, with severe recklessness, or negligently in engaging in the activities described herein.

90.     By reason of the foregoing, Thompson and F3 Mastermind have violated and, unless enjoined, will likely again violate, Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

## COUNT VII

### (Relief Defendant Stucki)

91.     The SEC realleges and incorporates by reference the allegations set forth in paragraphs 1 through 64 as if fully set forth herein.

92.     Relief Defendant Stucki received an improper transfer of investor money from at least one third-party operator of a prime bank scheme. The money Relief Defendant Stucki received constitutes ill-gotten gains from the Defendants' fraud as alleged in this Complaint. Relief Defendant Stucki has no legitimate claim to the ill-gotten gains he received as a result of Defendants' fraud.

93.     By reason of the foregoing, Stucki has been unjustly enriched and should be

compelled to return any funds that he still holds resulting from the misconduct alleged in this

Complaint, and Stucki should be held liable for all of the transfers of ill-gotten funds he received.

### RELIEF REQUESTED

**WHEREFORE,** the SEC respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that Defendants Thompson and F3

Mastermind committed the violations alleged herein.

### II.

Issue a Permanent Injunction restraining and enjoining Defendants Thompson and F3

Mastermind, their officers, agents, servants, employees, attorneys and those persons in active

concert or participation with Defendants Thompson and F3 Mastermind who receive actual

notice of the Order, by personal service or otherwise, and each of them from, directly or

indirectly, engaging in the transactions, acts, practices or courses of business described above, or

in conduct of similar purport and object, in violation of Section 10(b) of the Exchange Act [15

U.S.C. § 78j] and Rule 10b-5 thereunder [17 CFR § 240.10b-5], Section 17(a) of the Securities

Act [15 U.S.C. § 77q(a)], and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-

6(1) and 80b-6(2)].

### III.

Issue an Order requiring Defendants Thompson and F3 Mastermind to disgorge, jointly

and severally, the ill-gotten gains that they received, directly or indirectly, from the violations

alleged herein, including prejudgment interest, pursuant to Sections 21(d)(5) and 21(d)(7) of the

Exchange Act [15 U.S.C. §§ 78u(d)(5), (7)], and requiring Relief Defendant Stucki to disgorge

the amount by which he was unjustly enriched as a result of the Defendants' violations alleged in

this Complaint, including prejudgment interest, pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act.

## IV.

Issue an Order requiring Defendants Thompson and F3 Mastermind each to pay an appropriate civil penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

## V.

Issue an Order, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], permanently prohibiting Defendant Thompson from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l)] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court deems to be just and necessary.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff SEC hereby requests a trial by jury on all claims so triable.

Dated: May 3, 2024                   Respectfully submitted,

                                   UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

By: s/Eric M. Phillips
    Eric M. Phillips (phillipse@sec.gov)
    Matthew T. Wissa (wissam@sec.gov)
    U.S. Securities and Exchange Commission
    Chicago Regional Office
    175 West Jackson Blvd., Suite 1450
    Chicago, Illinois 60604
    Telephone: (312) 353-7390
    *Attorneys for Plaintiff*